IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| MIKE'S TRAIN HOUSE, INC. | * | |
| | * | |
| | * | |
| | * | |
| v. | * | Civil No. 16-cv-02031-JFM |
| | * | |
| | * | |
| METROPOLITAN TRANSPORTATION | * | |
| AUTHORITY | * | |
| | * | |
| | ****** | |

## MEMORANDUM

Plaintiff Mike's Train House ("Train House") brings this lawsuit against defendant

Metropolitan Transportation Authority ("MTA") seeking (1) a declaratory judgment that it did

not infringe or violate MTA's alleged trademarks or trade dress, and (2) trademark cancellation

under the Lanham Act. (ECF No. 13). Now pending is MTA's motion to dismiss the amended

complaint for lack of personal jurisdiction.[1] (ECF No. 16). The motion is fully briefed, and no

oral argument is necessary. *See* Local Rule 105.6. For the reasons stated below, this court cannot

exercise personal jurisdiction over MTA.

## BACKGROUND

Plaintiff Train House is a corporation located in Columbia, Maryland, that sells model

trains. (ECF No. 13, ¶ 2). Train House has sold subway cars replicating "real life subway cars

found in New York" for over a decade. *Id.* at ¶ 12. Defendant MTA is a "New York public

benefit corporation" whose "statutory purpose is to maintain the New York public transportation

---

[1] MTA had previously filed a motion to dismiss the original complaint (ECF No. 10), but filed
the instant motion in response to Train House's amended complaint (ECF No. 13). Accordingly,
this memorandum treats MTA's second motion as the operative motion to dismiss, and the first
will be denied as moot.

system." *Id.* at ¶¶ 2, 6. The parties' dispute arises out of MTA's decision to send cease-and-desist letters to Train House regarding Train House's alleged infringement of certain trademarks and copyrighted materials owned by MTA.

In 2006, MTA sent Train House a cease-and-desist letter alleging trademark and trade dress violations, but MTA never pursued any claims in 2006 after Train House denied infringement. *Id.* at ¶ 17. In May 2016, however, MTA once again sent cease-and-desist letters to Train House. Instead of acquiescing with MTA's cease-and-desist request, Train House brought this action in the U.S. District Court for the District of Maryland seeking: (1) a declaratory judgment that its "model subway products" did not infringe MTA's alleged trademarks and trade dress; (2) a declaratory judgment that its "model signs for use on model subway sets" did not infringe MTA's alleged copyrights; and (3) trademark cancellation of MTA's federal trademark registration of "NEW YORK CITY TRANSIT for model trains" under the Lanham Act. (ECF No. 13, ¶¶ 20-34). In response, MTA filed a motion to dismiss for lack of personal jurisdiction. (ECF No. 16). The relevant facts for the pending motion to dismiss are as follows.

## MTA

MTA is a "New York public benefit corporation with its principal place of business at 2 Broadway, New York, New York 10004." (ECF No. 13, ¶ 2). MTA does not have any operations or real estate interests in Maryland; it has no, employees who work in Maryland and no bank accounts in Maryland. (ECF No. 16, p. 3-4). MTA operates a website at nytransitmuseumstore.com where it solicits consumers, including those in Maryland, to purchase model trains, (ECF No. 13, ¶ 2), but the amount of sales stemming from Maryland totals only $4,016 (1.31% of total sales). (ECF No. 16, p. 12). And of these sales, only $192 is from sales of

the licensed products at issue here (less than 0.01% of total sales). *Id.* MTA also obtains royalty payments from its licensees, including Lionel, LLC ("Lionel") and Daron Worldwide Trading LLC ("DWT").

Lionel and DWT (licensees)

MTA exclusively licenses the trademarks, trade dresses, copyrights and designs it contends Train House is infringing to Lionel for use on model train equipment. (ECF No. 13, ¶ 8). Additionally, MTA non-exclusively licenses the trademarks, trade dresses, copyrights and designs that it contends Train House is infringing to DWT. *Id.* Neither Lionel nor DWT are headquartered in Maryland, nor do they have their principal place of business in Maryland. (ECF No. 16, p. 8). Lionel and DWT maintain a network of dealers who promote, advertise, distribute and sell model subway and toy subway products on a regular basis to customers nationwide, including in Maryland. Lionel and DWT distribute catalogues to customers and retailers in Maryland. Lionel advertises it is a licensee of MTA on its website, catalogues, and in materials accompanying products it sells. *Id.*

Licensing Agreements with Lionel and DWT

MTA's license agreements with Lionel and DWT contain various terms and provisions including, *inter alia*: (1) a term specifying the royalty amount to be paid to MTA; (2) clauses requiring licensees to obtain MTA's approval prior to manufacture of a licensed product; (3) a requirement that licensees submit annual reports; and (4) indemnification and insurance clauses requiring the licensee to defend and indemnify MTA from claims arising out of the licensing agreement. (ECF 16, Ex. 2). The agreements do not, however, require either MTA or its licensees to litigate in the event of infringement. *Id.* at ¶ 20(A-B). Rather, in the event of infringement, the licensee is required to merely notify MTA, and then MTA and the licensee will

3

"cooperate with each other and discuss and implement such strategy as they may agree upon[.]" *Id.* And in the event of legal action, MTA will "do so at its own expense." *Id.* MTA also exerts a "quality control" function over its licensees, but this function does not extend to controlling its licensees' marketing or sales decisions. *Id.*

### Other Enforcement Activities

There is no evidence of MTA engaging in any other enforcement-related activities in Maryland. For example, there are no allegations of MTA filing any infringement suits or engaging in any extra-judicial actions in Maryland regarding the copyrights, trademarks, and trade dress at issue here.

### STANDARD OF REVIEW

When a defendant files a motion to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citation omitted). "[A] court has broad discretion to determine the procedure that it will follow in resolving a Rule 12(b)(2) motion." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). For example, "[i]f the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). Alternatively, the court can decide the issue without a hearing because "[d]iscovery and an evidentiary hearing are not required to resolve a motion under Rule 12(b)(2)." *Sigala v. ABR of VA, Inc.*, 145 F. Supp. 3d 486, 489 (D. Md. 2015) (citing 5B Wright & Miller, Federal Practice & Procedure § 1351, at 274-313 (3d ed. 2004, 2012 Supp.)). In

4

considering a personal jurisdiction challenge in the absence of an evidentiary hearing, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 62 (4th Cir. 1993) (internal quotation marks, citation, and emphasis omitted).

## ANALYSIS

### I.    Personal Jurisdiction

For a district court to exercise personal jurisdiction over a nonresident defendant like MTA, two conditions must be satisfied: (1) the state's applicable long-arm statute must confer jurisdiction, and (2) the assertion of jurisdiction must comport with constitutional due process under the Fourteenth Amendment. *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). Maryland courts have consistently held that Maryland's long-arm statute "is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution," and so the statutory inquiry necessarily "merges with [the] constitutional examination." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016) (quoting *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 878 A.2d 567 (Md. 2005)). This does not, however, suggest analysis under the long-arm statute is irrelevant. *See Mackey v. Compass Mktg., Inc.*, 391 Md. 117, 141 n.6 (2006) (noting that although the "long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause," it is not "permissible to dispense with analysis under the long-arm statute"). "Indeed, there may be cases where personal jurisdiction is proper under constitutional due process but not under Maryland's long-arm statute." *Sigala*, 145 F. Supp. 3d at 490. As this court has stated previously regarding the intersection between the long-arm statue and the constitutional inquiry:

> [I]t does not follow from the principle that the General Assembly intended to "expand the exercise of personal jurisdiction to the limits of the due process clause" that the language of the long arm statute should be ignored; rather, a more correct understanding of the first principle is that to the extent that a defendant's activities are covered by the statutory language, the reach of the statute extends to the outermost boundaries of the due process clause.

*Joseph M. Coleman & Associates, Ltd. v. Colonial Metals*, 887 F. Supp. 116, 118 (D. Md. 1995).

Accordingly, I will examine these two requirements in turn.

### A. Maryland's Long-Arm Statute

"A plaintiff must specifically identify the Maryland statutory provision that authorizes jurisdiction, either in the complaint or in opposition to a Rule 12(b)(2) motion." *Sigala*, 145 F. Supp. 3d at 490.  Train House asserts this court "has personal jurisdiction over MTA under . . . Md. Code Ann. Cts. & Jud. Proc. Sections 6-103(b)(1) and 6-103(b)(2)." (ECF No. 13, ¶ 8). Maryland's long–arm statute provides, in relevant part:

> (a) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.
> (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:
>> (1) Transacts any business or performs any character of work or service in the State;
>> (2) Contracts to supply goods, food, services, or manufactured products in the State[.]

Md. Code Ann., Cts. & Jud. Proc. § 6-103.

As MTA has correctly highlighted, however, § 6-103(b)(2) is inapplicable here. (ECF No. 16, p. 7, n. 1).  "Courts in Maryland have interpreted subsection (b)(2) as relating only to contract actions." *Tech. Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d 903, 911 (D. Md. 2008), *aff'd sub nom. Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482 (Fed. Cir. 2012)) (citing *McLaughlin v. Copeland*, 435 F.Supp. 513, 529 (D.Md.1977)); *see also United Merchs. & Mfrs., Inc. v. David & Dash, Inc.*, 439 F. Supp. 1078, 1082–83 (D. Md.1977) (holding that a suit for infringement of federal copyright and unfair competition, which the court

acknowledged was essentially a "tort action," was "outside the scope of [subsection] (b)(2)," even though it "related to a contract"). Here, Train House has not alleged any contract in, or related to, Maryland that would satisfy § 6-103(b)(2).

Accordingly, Train House needs to establish § 6-103(b)(1) is applicable here. Regarding this subsection, this court has stated, "[a]lthough a defendant need not engage in commerce or … transactions for profit, Maryland courts have construed the phrase transacting business narrowly, requiring, for example, significant negotiations or intentional advertising and selling in the forum state." *Aphena Pharma Sols.-Maryland LLC v. BioZone Labs., Inc.*, 912 F. Supp. 2d 309, 321 (D. Md. 2012) (citing *Novack v. Nat'l Hot Rod Ass'n*, 247 Md. 350, 231 A.2d 22, 26 (1967), and *Music Makers Holdings, LLC v. Sarro*, Civil No. RWT–09–1836, 2010 WL 2807805, at *3 (D. Md. July 15, 2010)). In essence, the plaintiff must demonstrate "some purposeful act in Maryland in relation to one or more of the elements of [the] cause of action," *id.* (citing *Talegen Corp. v. Signet Leasing & Fin. Corp.*, 657 A.2d 406, 409 n. 3 (Md. Ct. Spec. App. 1995), that "culminate[s] in purposeful activity within the state," *id.* (citing *Bahn v. Chi. Motor Club Ins. Co.*, 634 A.2d 63, 67 (Md. Ct. Spec. App. 1993).

### B. Due Process Clause of the Fourteenth Amendment

Train House must allege facts establishing specific personal jurisdiction by a preponderance of the evidence.[2]  Regarding specific jurisdiction, "[d]ue process requires that personal jurisdiction over a non-resident defendant only be exercised where the defendant has certain minimum contacts with Maryland, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Music Makers*, 2010 WL 2807805, at *4

---

[2]  Train House concedes Maryland does not have general personal jurisdiction over MTA. Train House never mentions or suggests Maryland has general jurisdiction over MTA in its complaint or opposition brief, and it also conceded this point at a hearing held on October 31, 2016. (ECF Nos. 13 & 18).

(citing *Young Again Prods., Inc. v. Acord,* 307 F.Supp.2d 713, 715 (D. Md. 2004)). In order to

determine whether a defendant can be held subject to specific jurisdiction in Maryland, this court

considers: (1) whether the defendant "purposely directed its activities toward residents of

Maryland or purposely availed itself of the privilege of conducting activities in the state"; (2)

whether its claims "arise[] out of or result[] from" those activities; and (3) whether the exercise

of personal jurisdiction would be constitutionally "reasonable." *Cole–Tuve, Inc. v. Am. Mach.*

*Tools Corp.*, 342 F. Supp. 2d 362, 366 (D. Md. 2004) (internal quotation marks and citation

omitted). The plaintiff must prevail on each prong in order for the court to assert specific

jurisdiction over the defendant. Only if the court finds that the plaintiff has satisfied the first

prong of this test does it then consider prongs two and three. *Consulting Engineers Corp. v.*

*Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

Additionally, this court acknowledges declaratory judgment actions are atypical.

Analogizing to declaratory judgment cases in the patent context reveals that because the "nature

of the claim in a declaratory judgment action is 'to clear the air of infringement charges[,]'" . . .

the claim "neither directly arises out of nor relates to the making, using, offering to sell, selling,

or importing of arguably infringing products in the forum." *Avocent Huntsville Corp. v. Aten Int'l*

*Co.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008). Instead, in this context, the claim "arises out of or

relates to the activities of the defendant patentee in enforcing the patent or patents in suit." *Id.*

Accordingly, "the relevant inquiry for specific personal jurisdiction purposes then becomes to

what extent has the defendant patentee 'purposefully directed [such enforcement activities] at

residents of the forum,' and the extent to which the declaratory judgment claim 'arises out of or

relates to those activities.'" *Id.* at 1332-33 (citing *Breckenridge Pharm., Inc. v. Metabolite Labs.,*

*Inc.*, 444 F.3d 1356, 1363 (Fed. Cir. 2006)). "While 'the plaintiff need not be the forum resident

8

toward whom any, much less all, of the defendant's relevant activities were purposefully directed,' *Akro,* 45 F.3d at 1547 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774 (1984) and *Calder v. Jones,* 465 U.S. 783, 790 (1984)), we have consistently required the defendant to have engaged in 'other activities' that relate to the *enforcement* or the *defense of the validity* of the relevant patents." *Id.* at 1334 (emphasis added).

## II.    MTA's alleged contacts with Maryland

Train House contends Maryland can exercise personal jurisdiction over MTA through some combination of MTA's alleged contacts with Maryland. Below is a discussion of the alleged contacts implicated in this case, including: (a) MTA's cease-and-desist letters; (b) MTA's exclusive and non-exclusive licensing agreements that do not impose enforcement requirements in the event of infringement; (c) the amount of control MTA exerts over its licensees; (d) MTA's revenues collected from licensees; (e) MTA's revenues collected directly through its own sales; and (f) other enforcement activities, whether judicial or extra-judicial in nature. I analyze these in turn.

### A. *Cease-and-desist letters*

Maryland courts, relying on the "overwhelming weight of the case law" have concluded "cease-and-desist letters alone are not sufficient to invoke specific personal jurisdiction." *Music Makers,* 2010 WL 2807805, at *6. Although cease-and-desist letters can show purposeful activities by MTA towards Train House in Maryland, and the declaratory judgment claims essentially arise out of those letters, courts have determined that, as a matter of policy, the exercise of personal jurisdiction based simply on sending these letters would not be reasonable and fair as required by due process:

> [E]ven though the letters are "purposefully directed" at the forum and the declaratory judgment action "arises out of" the letters, letters threatening suit for

9

patent infringement sent to the alleged infringer by themselves "do not suffice to create personal jurisdiction" because to exercise jurisdiction in such a situation would not "comport with fair play and substantial justice." For the exercise of personal jurisdiction to comport with fair play and substantial justice, there must be "other activities" directed at the forum and related to the cause of action besides the letters threatening an infringement suit.

...

The patent system has national application. If infringement letters created jurisdiction, the patentee could be haled into court anywhere the letters were sent.

*Silent Drive, Inc. v. Strong Industries, Inc.*, 326 F.3d 1194, 1202 (Fed. Cir. 2003). Similarly, in

*Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355 (Fed. Cir. 1998), the

Federal Circuit stated:

A better explanation for this court's statement that cease-and-desist letters alone do not suffice to create personal jurisdiction lies in the second prong of the traditional Due Process inquiry. This prong examines whether the maintenance of personal jurisdiction would "comport with 'fair play and substantial justice.'" Thus, even though cease-and-desist letters alone are often substantially related to the cause of action (thus providing minimum contacts), the "minimum requirements inherent in the concept of 'fair play and substantial justice' ... defeat the reasonableness of jurisdiction." Principles of fair play and substantial justice afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum. A patentee should not subject itself to personal jurisdiction in a forum solely by informing a party who happens to be located there of suspected infringement. Grounding personal jurisdiction on such contacts alone would not comport with principles of fairness.

*Id.* at 1361. Furthermore, Maryland courts have held "[a] defendant does not 'transact business' within the meaning of section 6–103(b)(1) of Maryland's long-arm statute by sending written communications to a purported infringer of its rights." *Music Makers*, 2010 WL 2807805, at *6.

Here, although MTA has sent cease-and-desist letters to Train House in 2006 and 2016, these letters will not allow Maryland courts to exercise personal jurisdiction over MTA based on these contacts alone. Accordingly, there must be additional contacts in order for an exercise of personal jurisdiction over MTA to be proper.

### B. MTA's license agreements do not impose enforcement obligations

10

Train House suggests personal jurisdiction can be exercised over MTA because, in part, MTA has licensed its products to companies that conduct business in Maryland, and because those agreements allow MTA "the right to pursue claims for patent infringement." (ECF No. 18, pp. 5-6). Despite this assertion, Train House overlooks a critical issue; specifically, only one of these license agreements is an exclusive agreement, and more importantly, neither agreement *imposes* any enforcement *requirements* on MTA, Lionel, or DWT. The lack of a contractual requirement to take action when faced with potential infringement suggests personal jurisdiction is improper.

MTA's license agreements have the potential to establish sufficient contacts within Maryland, particularly if they impose enforcement obligations on MTA. The Federal Circuit has stated:

> [W]hen the patentee enters into an exclusive license or other obligation relating to the exploitation of the patent by such licensee or contracting party in the forum, the patentee's contractual undertaking may impose certain obligations to enforce the patent against infringers. By such conduct, the patentee may be said to purposefully avail itself of the forum and to engage in activity that relates to the validity and enforceability of the patent.

*Avocent*, 552 F.3d at 1336 (emphasis added). For example, in *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, the Federal Circuit found the exercise of specific personal jurisdiction was constitutionally permissible where the patentee had (1) entered into an exclusive license with a nonresident of the forum, (2) who did business in the forum, (3) the patentee's acts went beyond merely receiving licensing revenues since the patentee collaborated with the exclusive licensee to send the cease and desist letters into the forum, (4) and the patentee had obligations to coordinate with the exclusive licensee over enforcement of the patent by litigation. 444 F.3d 1356, 1369 (Fed. Cir. 2006) (emphasis added). Similarly, in *Akro Corp. v. Luker*, the Federal Circuit found personal jurisdiction over a patentee who had exclusively licensed the

11

plaintiff's local competitor to practice the relevant patent, where the license agreement also *"oblige[d] [the patentee] 'to defend and pursue any infringement* against' the [relevant] patent." 45 F.3d 1541, 1548-49 (Fed. Cir. 1995) (emphasis added).

Conversely, when an exclusive license does not obligate a patentee to enforce the patent in the forum, or merely permits the licensee to bring enforcement actions without the patentee's consent, personal jurisdiction may be lacking. *See, e.g., New World International, Inc. v. Ford Global Technologies*, LLC, 2016 WL 1069675, *10-*14 (N.D. Tex. 2016); *see also Petzila, Inc. v. Anser Innovation LLC*, 620 F. App'x 941, 944 (Fed. Cir. 2015) ("The agreement did not give . . . an exclusive license to the [] patent, obligate [patentee] to enforce the [] patent, or give [licensee] the right to sue others for infringement of the [] patent.").

Here, MTA has one exclusive license with Lionel, and one non-exclusive license with DWT. Neither licensee is headquartered in Maryland. (ECF No. 16, p. 8). Neither licensee has its principal place of business in Maryland. *Id.* Critically, neither agreement *imposes* enforcement requirements on either MTA or its licensees. Rather, the agreements merely require the licensees to "notify MTA of potential or actual infringement and any action or threatened action against the marks"; subsequently, the agreements require "[licensee] and MTA to cooperate on an appropriate strategy in the event of infringement by others." (ECF No. 16, p.18).

Accordingly, because neither MTA nor Lionel nor DWT is required to commence litigation in the face of potential infringement, Maryland's exercise of personal jurisdiction over MTA would be improper.

### C. MTA's control over its licensees

Train House next alleges Maryland can exercise personal jurisdiction over MTA because MTA exercises "extensive control" over its licensees Lionel and DWT. (ECF No. 18, p. 12).

12

Indeed, "[w]here a defendant-licensor has a relationship with an exclusive licensee headquartered or doing business in the forum state, the inquiry requires close examination of the license agreement." *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1366 (Fed. Cir. 2006). MTA agrees that "[a] key factor in evaluating whether a licensor's status confers jurisdiction is the amount of control the licensor retains over the licensee." (ECF No. 16, p. 8) (citing *Eco Pro Painting, LLC v. Sherwin-Williams Co.*, 807 F. Supp. 2d 732, 736–37 (N.D. Ill. 2011)). Where the parties disagree, however, is the amount of control each believes MTA exerts over its licensees. MTA suggests its "control over Lionel and DWT is limited . . . to quality control over its marks but not extending to either's marketing or sales decisions." (ECF No. 16, p. 8). Contrastingly, Train House suggests the license agreements require "substantially more collaboration between [the parties]," and it focuses on provisions in the agreements including indemnification provisions, insurance provisions, and cooperation and enforcement provisions. (ECF No 18, pp. 7-9).

In order for a court's exercise of personal jurisdiction to be proper, "case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as . . . granting the licensor the right to exercise control over the licensee's sales or marketing activities." *Breckenridge*, 444 F.3d 1366. Train House essentially relies on two cases to support its assertion that personal jurisdiction is proper: *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.* and *Genetic Implant Sys., Inc. v. Core-Vent Corp.*

In *Core-Vent*, the Federal Circuit found an exercise of personal jurisdiction was proper because of various factors. 123 F.3d 1455, 1459 (Fed. Cir. 1997). Train House characterizes the Federal Circuit's reasoning as to why jurisdiction was proper in *Core-Vent* as: "(1) defendant retained the right to pursue claims for patent infringement, (2) defendant agreed to indemnify

13

licensee for liability arising from any patent infringement claim asserted against licensee, and (3) defendant agreed to maintain all patents covering the licensed products." (ECF No. 18, p. 6) (citing *Core-Vent*, 123 F.3d at 1459). *Core-Vent* is, however, distinguishable from the present case. In *Core-Vent* the court stressed the extensive contacts Core-Vent had with the forum prior to the grant of the patent; specifically, "[Core-Vent] engaged in a program to develop a market in Washington . . . [and these] pre–1991 activities resulted in substantial revenue from sales in Washington and contributed to Core–Vent's presence in Washington." *Id.* at 1458. Here, there are no allegations MTA had an extensive relationship, sales or otherwise, in Maryland prior to entering its licensing agreements. Additionally, in *Core-Vent*, the patentee was also engaged in directing the marketing efforts of its licensee. (ECF No. 19, pp. 5-6). This is not the case here because neither license agreement gives MTA the "ability to direct the marketing or sales efforts of the licensee." (ECF No. 16, p. 9). And neither agreement allows MTA to control its licensee's use of dealers or distribution channels. *Id.* at 10. There does appear to be one clause "requiring Lionel to participate in a holiday season exhibit in Grand Central Terminal in New York City," but this exception is not evidence of general control over Lionel's marketing. *Id.* Rather, this is merely "a once a year requirement that Lionel engage in a single specific marketing event in New York City, not Maryland." *Id.*

In *Breckenridge*, the Federal Circuit found an exercise of personal jurisdiction was proper where a patentee entered into an exclusive license. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356 (Fed. Cir. 2006). However, in *Breckenridge*, unlike here, there were additional factors supporting an exercise of personal jurisdiction. For example, in that case, the patentee provided the licensee "full control of the prosecution or maintenance" of any patent the patentee permitted to lapse. *Id.* at 1366. The agreement also provided the patentee "with an

executed power of attorney for that purpose." *Id.* Furthermore, the licensee in that case agreed to "provide consultation to [the patentee] in the science, medicine and marketing of vitamins and related products, from time to time." *Id.* at 1367. And going further, both the patentee and licensee in that case coordinated in sending cease-and-desist letters, and were often represented jointly by counsel. *Id.* In essence, as the court stated, the "exclusive license agreement not only *contemplated* an ongoing relationship between [patentee] and [licensee] beyond royalty payments but has *actually resulted* in such a relationship is obvious from the facts of this case." *Id.* (emphasis in original).

Here, there is no question that MTA does not have the type of close relationship with Lionel and DWT as the patentee and licensee had in *Breckenridge*. MTA alleges it "does not consult with Lionel or DWT with regard to the development of their products; it simply exercises quality control review over the use of its marks within those products and, in the case of Lionel, provides schematics to assist Lionel in its quest for authenticity." (ECF No. 18, p. 7). There is also no suggestion MTA coordinated with its licensees in sending its cease-and-desist letters as the parties in *Breckenridge* did.

Train House additionally suggests MTA performs "quality control over Lionel's and DWT's use of the MTA's trademarks, trade dresses, copyrights," suggesting this confers personal jurisdiction. (ECF No. 13, ¶ 8). But this is also misguided. As MTA contends, "[a] licensor may retain *significant* quality control over a licensee that engages in business in the forum state yet still lack sufficient minimum contacts with the forum state." *Eco Pro Painting*, 807 F. Supp. 2d at 737 (emphasis added); *see also Sunshine Kids Found. v. Sunshine Kids Juvenile Prods., Inc.*, No. CIV. A. H-09-2496, 2009 WL 5170215, at *7 (S.D. Tex. Dec. 18, 2009) ("the court is not aware of any case in which a licensor's exercise of quality control over a

licensee has been held sufficient to support the exercise of personal jurisdiction over a licensor"). Although MTA does review and approve the use of its marks by Lionel and DWT, this exercise of a quality control function does not create minimum contacts with Maryland. (ECF No. 13, ¶ 8). As MTA correctly points out, "[s]uch a distinction recognizes that the quality control function has no bearing on any particular state—it is a general process all trademark holders must undertake in order to protect their marks from misuse and evaluation and no more purposefully avails MTA of Maryland's laws than does owning the trademark generally." (ECF No. 16, p. 9).

Accordingly, I find MTA does not exert sufficient control over its licensees' Maryland activities to support an exercise of personal jurisdiction.

### D. Revenues collected from licensees

Train House further suggests Maryland's exercise of personal jurisdiction is proper over MTA because MTA derives revenue from its licensees' sales in Maryland. Indeed, Train House repeatedly refers to Lionel's and DWT's sales and sales-related activities in Maryland, suggesting these contacts are relevant to the personal jurisdiction analysis. (ECF No. 13, ¶ 8). For example, Train House alleges in its complaint "MTA . . . profits from the sale of the products to customers located in Maryland, including from the sales made by MTA . . . through the sales made by Lionel and DWT." *Id.* Furthermore, Train House states "Lionel and DWT continuously sell[] a substantial number of model trains, model subways and toy subways bearing the trademarks, trade dresses, copyrights and designs that MTA alleges are being infringed by Train House to customers located in Maryland and has earned substantial revenues from such sales." *Id.*

16

Despite this, however, MTA's "receipt of royalties from licensees for sales made in the forum state or the licensee's business in the forum state are generally insufficient and irrelevant to establishing personal jurisdiction over the patentee where the patentee has no control over the licensee." 5 Annotated Patent Digest § 36:125. For example, in *Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.*, the Federal Circuit clarified:

> '[F]inancial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with that State.' Because the contacts of HHI's licensees with Minnesota are not 'constitutionally cognizable' for purposes of jurisdiction over HHI, any *financial benefits accruing to HHI from its licensees' relations with Minnesota are irrelevant.*"

148 F.3d 1355, 1361–62 (Fed. Cir. 1998) (emphasis added).

Therefore, any sales derived by MTA through its licensees' sales are irrelevant to the analysis given the lack of control MTA exerts over Lionel and DWT, discussed *supra* (II)(C). Accordingly, these revenue streams do not support a finding of personal jurisdiction over MTA.

### E. *MTA's own marketing efforts and online sales*

Train House also repeatedly refers to MTA's own sales in Maryland and MTA's advertising efforts directed at Maryland residents, suggesting these contacts support a finding of personal jurisdiction. Specifically, Train House alleges "MTA operates an interactive website at nytransitmusuemstore.com where it . . . continuously solicits consumers located in Maryland to purchase model trains." (ECF No. 13, ¶ 8). Train House further alleges in its complaint "MTA regularly sends advertising and promotional materials for model trains, subway cars and toy subway products featuring the trademarks, trade dresses, copyrights and designs that it alleges Train House is infringing to customers located in Maryland, intends that the advertised products are sold to customers located in Maryland and profits from the sale of the products to customers located in Maryland." *Id.* MTA counters its sales in Maryland are *de minimis* (roughly 1.31% of

17

the online store's sales), and its sales in Maryland of the licensed products at issue are even less

(only $192 of $307,000 in total sales, or less than 0.01% of sales). (ECF No. 16, p. 12).  Even if

the sales were significant, however, MTA's sales and advertising efforts are largely irrelevant for

the jurisdictional analysis in the declaratory judgment context and do not support a finding of

personal jurisdiction.

"In the Fourth Circuit, the mere act of 'placing information on the Internet is not

sufficient by itself to subject that person to personal jurisdiction in each State in which the

information is accessed.'" Music Makers, 2010 WL 2807805, at *7 (citing *Carefirst,* 334 F.3d at

399) (quotation marks and alterations omitted)).  Instead, the defendant "must have acted with

the manifest intent of targeting Marylanders." *Id.* (citing at *Carefirst,* 334 F.3d at 400).

Specifically, "[t]he Fourth Circuit has adopted a 'sliding scale' model for website-based specific

jurisdiction, a model that was first articulated by the United States District Court for the Western

District of Pennsylvania in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.,* 952 F. Supp. 1119,

1124 (W.D. Pa. 1997)." *Id.* (citing at *Carefirst,* 334 F.3d at 399).  As the Fourth Circuit

explained:

> At one end of the spectrum are situations where a defendant clearly does business
> over the Internet. If the defendant enters into contracts with residents of a foreign
> jurisdiction that involve the knowing and repeated transmission of computer files
> over the Internet, personal jurisdiction is proper. At the opposite end are situations
> where a defendant has simply posted information on an Internet Web site which is
> accessible to users in foreign jurisdictions. A passive Web site that does little
> more than make information available to those who are interested in it is not
> grounds for the exercise of personal jurisdiction. The middle ground is occupied
> by interactive Web sites where a user can exchange information with the host
> computer. In these cases, the exercise of jurisdiction is determined by examining
> the level of interactivity and commercial nature of the exchange of information
> that occurs on the Web site.

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 714 (4th Cir. 2002) (citing *Zippo,*

952 F. Supp at 1124).  In adopting this model, the Fourth Circuit held:

18

[A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*Id.* However, this court has stated the "*Zippo* model does not supersede the traditional personal jurisdiction analysis, it merely compliments it." *Eagle Coffee Co. v. Eagle Coffee Int'l, Inc.*, No. CIV. L-09-2585, 2010 WL 481201, at *3 (D. Md. Feb. 4, 2010).

Construing the complaint in the light most favorable to plaintiff, Train House has alleged MTA "directed electronic activity into Maryland by using its website to advertise and offer its products for sale to Maryland customers, with the manifest intent of engaging Maryland customers in sales transactions, and that the [present] claim arises out of the activities in Maryland." *See id.* (examining a similar website in the trademark infringement context). Despite these allegations, this court is not persuaded Train House has "established sufficient minimum contacts with Maryland such that [MTA] would reasonably anticipate being haled into court here." *Id.*

This case is strikingly similar to *Eagle Coffee Co. v. Eagle Coffee Int'l, Inc.*, where this court examined Eagle Hill International's website and found insufficient contacts to establish personal jurisdiction. There, the court noted "nothing on International's website suggests that it intended to target the residents of Maryland (or any state) more than residents of any other state." *Id.* Like International, MTA has done nothing to target the residents of Maryland more than the residents of any other state. Furthermore, in *Eagle Coffee*, the court found that International's sales to Maryland customers, amounting to less than 0.1% of total sales, were "isolated occurrences" that did not establish International "engaged in significant activities within" Maryland, or that it "created 'continuing obligations' between [itself] and residents of [Maryland]." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)). Here,

19

MTA's sales of licensed products in Maryland amounted to less than 0.01% of its sales, even less than in *Eagle Coffee*.

Personal jurisdiction cases in the declaratory judgment context further reinforce the conclusion personal jurisdiction is lacking here.  Prior to the 2008 opinion in *Avocent Huntsville Corp. v. Aten Int'l Co., Ltd.*, the law seemed to suggest that a patentee's own attempts at selling its patented product in a forum *could* give rise to sufficient contacts to exercise specific personal jurisdiction under a "stream of commerce theory."  552 F.3d 1324, 1332–36 (Fed. Cir. 2008).  But, "[i]n *Avocent*, the Federal Circuit expressly held that a patentee's efforts to directly market its product in a forum . . . does *not* provide a jurisdictional contact for purposes of assessing *specific* jurisdiction to support a patent-challenging declaratory action against a patentee." 5 Annotated Patent Digest § 36:127.  There, the court stated:

> In short, a defendant patentee's mere acts of making, using, offering to sell, selling, or importing products—whether covered by the relevant patent(s) or not—do not, in the jurisdictional sense, relate in any material way to the patent right that is at the center of any declaratory judgment claim for non-infringement, invalidity, and/or unenforceability. Thus, we hold that such sales do not constitute such "other activities" as will support a claim of specific personal jurisdiction over a defendant patentee. While such activities may in the aggregate justify the exercise of *general* jurisdiction over the patentee, they do not establish a basis for *specific* jurisdiction in this context

*Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1336 (Fed. Cir. 2008); *see also Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1020 (Fed. Cir. 2009) ("[O]nly enforcement or defense efforts related to the patent rather than the patentee's own commercialization efforts are to be considered for establishing specific personal jurisdiction in a declaratory judgment action against the patentee.").  According to this standard, MTA's sales are essentially irrelevant in the declaratory judgment context.

Accordingly, MTA's own sales through its online store cannot support a finding of personal jurisdiction over MTA.

### F.  *Judicial and extra-judicial enforcement activities*

MTA's prior infringement suits in Maryland "can show enforcement activity, for purposes of the due process fairness analysis, sufficient to support exercising specific personal jurisdiction for a declaratory judgment action" brought Train House. 5 Annotated Patent Digest § 36:124.50. Similarly, any extra-judicial efforts by Train House or its licensees to interfere with MTA might support an exercise of personal jurisdiction. *See, e.g., Campbell Pet Co. v. Miale,* 542 F.3d 879, 886 (Fed. Cir. 2008) (finding jurisdiction over a patentee whose "extra-judicial patent enforcement," namely, enlisting a third party to remove defendant's products from a trade show that was being held in the forum state, went beyond merely informing the defendant of its alleged infringement).

Here, there are no allegations in the complaint that MTA or its licensees have brought infringement suits or interfered with Train House extra-judicially in Maryland (or outside of Maryland). This suggests Maryland's exercise of personal jurisdiction over MTA would be improper.

### III.   **Additional jurisdictional discovery**

Train House requests, in the alternative, that if this court is inclined to grant MTA's motion to dismiss, that it instead grant it leave to conduct jurisdictional discovery. Train House suggests it would seek "limited discovery concerning: (1) Defendant's communications with its licensees relating to the quality and control of goods and trade channels; (2) Defendant's licensees, including Daron and Lionel, sale of goods bearing the intellectual property that MTH is alleged to have infringed in Maryland; (3) the sending of cease-and-desist letters on behalf of Defendant or its licensees to individuals residing or doing business in Maryland; (4) the activities of Defendant's Licensing Agent in Maryland; and (5) the sale of goods to Maryland residents

through Defendant's brick-and-mortar and online store prior to March 1, 2015." (ECF No. 18, p. 14). Much of what Train House seeks discovery over, however, has little to no bearing on the jurisdictional analysis. For example, discovery concerning Lionel or DWT's sales, MTA's sales, and the sending of cease-and-desist letters, are either irrelevant to the analysis or unlikely to support a finding of jurisdiction.

While discovery, including jurisdictional discovery, under the Federal Rules of Civil Procedure is "broad in scope and freely permitted," *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993), courts within this circuit typically only allow jurisdictional discovery if there are disputed factual issues. See *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989) ("If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question."). Furthermore, "'[w]hen a plaintiff offers only speculation or conclusory assertions about [a defendant's] contacts with a forum state' in the face of specific denials made by the defendant, the court is within its discretion to deny the plaintiff's request for jurisdictional discovery." *Am. Ass'n of Blood Banks v. Boston Paternity, LLC*, Case No. 8:08-cv-2046-DKC, 2009 WL 2366175, at *11 (D. Md. July 28, 2009) (quoting *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.*, Inc., 334 F.3d 390, 402-03 (4th Cir. 2003)).

Here, the facts are not in dispute; rather Train House is requesting permission from this court to embark on a fishing expedition. Train House already has MTA's actual licensing agreements and can find any judicial enforcement actions undertaken by MTA or its licensees in the forum. The record appears to be fully developed, and MTA has made specific denials to Train House's conclusory assertions about MTA's contacts with Maryland, including providing actual sales figures.

Accordingly, I deny Train House's request to seek additional discovery.

## CONCLUSION

Train House contends personal jurisdiction over MTA is proper on the basis of MTA's activities, considered collectively. Train House's argument, if accepted, would result in the conclusion that MTA can be sued in any jurisdiction. However, for the foregoing reasons, MTA's activities are insufficient to establish personal jurisdiction under either the Maryland long-arm statute or the United States Constitution. Accordingly, MTA's motion to dismiss (ECF No. 16) is granted. A separate order follows.


_____
Date

_____
J. Frederick Motz
United States District Judge

23